869 So.2d 475 (2003)
J.B.
v.
JEFFERSON COUNTY DEPARTMENT OF HUMAN RESOURCES.
S.C.
v.
Jefferson County Department of Human Resources.
2010469 and 2010506.
Court of Civil Appeals of Alabama.
June 30, 2003.
*477 Casandra D. Velarde, Bessemer, for appellant J.B.
Thomas J. Huseman, Bessemer, for appellant S.C.
William H. Pryor, Jr., atty. gen., and J. Coleman Campbell, deputy atty. gen., and Lynn S. Merrill, asst. atty. gen., Department of Human Resources.
MURDOCK, Judge.
J.B., the father, and S.C., the mother, appeal from a judgment of the Jefferson Juvenile Court terminating their parental rights to their son, B.C.C., and awarding permanent custody of B.C.C. to the Department of Human Resources ("DHR") for adoptive placement. The parents argue that DHR did not present clear and convincing evidence that it made reasonable efforts to rehabilitate them and that there were no viable alternatives to termination of their parental rights. The mother also argues that the trial court erred when it allowed a police detective to testify regarding a taped confession that was used against the mother in a criminal case arising out of the death of the mother's two-year-old daughter, B.C.C.'s sister. The criminal case resulted in the mother's conviction for manslaughter.
The mother and the father were never married to each other; they lived together until a few months before the birth of their second child, B.C.C., in June 1998. In March 1999, Jefferson County DHR filed a petition in the trial court alleging that B.C.C.'s two-year-old sister had died under suspicious circumstances and requesting that it be awarded temporary custody of B.C.C. The trial court granted DHR's petition, and, shortly thereafter, the mother was charged with capital murder in the death of B.C.C.'s sister. B.C.C. was approximately nine months old at the time of his sister's death. He had never seen his father.
A few weeks after temporary custody of B.C.C. was granted to DHR, a paternal great-aunt and great-uncle of B.C.C., who were Alabama residents, filed a petition in the trial court alleging that J.B. was the father of B.C.C. and requesting that the court order him to submit to a blood test for purposes of establishing his paternity. The paternal great-aunt and great-uncle also filed a petition requesting that they be granted temporary custody of B.C.C. The trial court ordered J.B. to submit to a blood test, and, after the blood-test results were submitted to the trial court, it adjudicated J.B. to be the father of B.C.C. in September 1999.
Notwithstanding the adjudication of paternity, J.B. did not seek custody of B.C.C. or visitation with B.C.C. When the trial court asked J.B. at the paternity hearing if he wanted custody of B.C.C., J.B. responded that he was "not stable" and that he could not financially provide for B.C.C. Thereafter, the trial court ordered that the paternal great-aunt and great-uncle be granted visitation with B.C.C., but it left B.C.C. in the temporary custody of DHR. The paternal great-aunt and great-uncle subsequently withdrew their petition for temporary custody of B.C.C.
In the spring of 2000, the trial court entered an order postponing consideration of a permanency plan for B.C.C. until the disposition of the mother's criminal case. In September 2000, the mother was convicted of manslaughter in the death of B.C.C.'s sister and was sentenced to 20 years' incarceration. A few weeks later, in November 2000, Jefferson County DHR filed a petition to terminate the parental rights of the mother and a petition to terminate the parental rights of the father. By that time, B.C.C. was two years and four months old; the father had never made any effort to see B.C.C., and B.C.C. had not, in fact, ever seen the father.
The cases were tried in May 2001. By the time of trial, B.C.C. was almost three years old and had been in the custody of the same foster parents for over two years. *478 The foster mother testified that she and her husband desired to adopt B.C.C. Two days before trial, however, L.G., a paternal great-aunt, who lived in California and had never seen B.C.C., wrote a letter to the trial court stating that she and her husband, R.G., were also interested in adopting B.C.C. The trial court decided to treat L.G.'s request as a motion to intervene in the termination proceeding. However, rather than delay the trial of the termination case, the trial court allowed DHR to proceed with its case and entered an order stating that it would not render its decision on the termination of the parents' parental rights until after a home study was conducted on L.G. and R.G.
Approximately six months after trial, the San Diego County Health and Human Services Agency filed a favorable home evaluation on L.G. and R.G., stating that L.G. and R.G. were interested in adopting B.C.C. Thereafter, the trial court entered a judgment stating, in pertinent part:
"[T]his Court finds that the child's natural parents ... are unable or unwilling to discharge their responsibilities to or for the child and such conduct or condition is unlikely to change in the foreseeable future and there exist no viable alternatives to termination of the parents' custodial rights. This Court notes that [the] natural mother of said child has been convicted of the offense of manslaughter in the death of said child's sibling and is presently in the custody of the Alabama Department of Corrections. This Court further notes that the child's natural father was incarcerated for various felony convictions at the time of this hearing and has never seen said minor child. This Court notes that DHR has made reasonable efforts toward reunification to no avail. That no family members of either parent were interested in gaining custody of said minor child until the child's paternal great-aunt filed a request to adopt [the] child two days before this trial was set after said child had been in the custody of [DHR] since March of 1999. This Court finds that it is in the child's best interest that all parental rights that [the parents] have in and to said child are hereby terminated and permanent custody of said child is awarded to [DHR] for the purpose of adoption."
The father and the mother filed separate appeals and we entered an order consolidating the cases for purposes of appeal. The mother and the father argue that DHR failed to make reasonable efforts to rehabilitate them, that it failed to present evidence of recent attempts to locate a viable alternative to termination of their parental rights, and that custody of B.C.C. should have been granted to L.G. and R.G. instead of terminating the mother's and the father's parental rights. The mother also argues that the trial court erred when it allowed a detective from the Jefferson County Sheriff's Department to testify regarding a tape-recorded statement that the mother made during the investigation of B.C.C.'s sister's death. The mother argues that she was represented by legal counsel in the dependency proceeding at the time that she gave the recorded statement to the detective, that the detective knew that she was represented by legal counsel, and that the detective failed to notify or refused to notify her attorney that the statement was being taken.
We will first address the mother's argument that the trial court erred by allowing the detective who had interrogated the mother during the criminal investigation of B.C.C.'s sister's death to testify regarding her recorded confession. DHR filed a dependency petition on March 22, 1999, and, based upon the mother's request, the trial court appointed counsel to represent her *479 in the dependency proceeding on that date. Two days later, a detective from the Jefferson County Sheriff's Department interrogated the mother and recorded a statement from her in connection with the police investigation of B.C.C.'s sister's death. In the statement, a recording of which was played at trial and accepted into evidence over the mother's objection, the mother admitted that on the date of her daughter's death she had struck her daughter "pretty hard" in the abdomen with a coke bottle that had approximately two inches of M & M candies in the bottom.[1] She stated that she believed that the blow had something to do with her daughter's death and that it was the only way that the child could have been injured.[2] In the taped conversation, the mother also acknowledged that she had been "Mirandized" and that she had read and executed a waiver of her "Miranda rights."
At trial, the detective testified that he was a member of the State's death-review team, that the Bessemer police department had requested that he interview the mother and conduct a polygraph examination of her, and that he had interviewed the mother at the Jefferson County Sheriff's Department office. The detective also stated that the mother had executed a waiver of her Miranda rights, that she had not informed him that she had an attorney, that he had no knowledge that she had an attorney when he interviewed her, and that the taped interview had been admitted into evidence in the criminal case that resulted in her manslaughter conviction.
The only authority cited by the mother in support of her argument that the trial court erred when it permitted the detective to testify regarding her taped confession is Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In Massiah, police investigators convinced a codefendant to plant a radio transmitter in Massiah's automobile and to obtain a confession from him; at that time, Massiah had already been indicted on the criminal offense at issue and was represented by legal counsel. The United States Supreme Court held that the use of the confession against Massiah in the criminal proceeding violated his right to the assistance of counsel under the Sixth Amendment to the United States Constitution. See Massiah, 377 U.S. at 205-06, 84 S.Ct. 1199.[3] The mother has cited no authority in support of her argument that a confession that has been admitted in a criminal proceeding may not be used in a civil proceeding if the accused had retained legal counsel in the civil proceeding *480 and that counsel was not informed of an interrogation that occurred as part of the criminal investigation. Further, the mother admitted in her testimony at trial that she had been convicted of manslaughter in the death of her daughter and that she had struck her daughter with the bottle containing M & M candies. Therefore, any error that the trial court might have made in allowing the detective to testify regarding the mother's confession was harmless. See Pfingstl v. Solomon, 240 Ala. 58, 64, 197 So. 12, 16 (1940). In regard to the substantive issues raised by the mother and the father, when a trial court's decision to terminate parental rights is based on evidence presented ore tenus, we will presume that the judgment is factually correct and will reverse the trial court only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. M.H.J. v. State Dep't of Human Res., 785 So.2d 372 (Ala.Civ.App.2000).
"A parent has a prima facie right to custody of his or her child and this right can be overcome only by clear and convincing evidence that the child's best interests would be served by permanently terminating the parent's custody.... The best interest of the child is the primary concern in a proceeding to terminate parental rights."
Ex parte State Dep't of Human Res., 624 So.2d 589, 591 (Ala.1993) (emphasis added).
In Ex parte Beasley, 564 So.2d 950 (Ala. 1990), our Supreme Court stated:
"The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in [Ala.Code 1975,] § 26-18-7. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. ([In addition], if a nonparent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)"
Ex parte Beasley, 564 So.2d at 954. See Ex parte State Dep't of Human Res., 624 So.2d at 592-93 (applying Ex parte Beasley); see also Ala.Code 1975, § 12-15-71(a).
The 1984 Child Protection Act, Ala.Code 1975, § 26-18-1 et seq. ("the CPA"), provides, in pertinent part, that a court may terminate parental rights
"[i]f the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future."
Ala.Code 1975, § 26-18-7(a). The Alabama Juvenile Justice Act, Ala.Code 1975, § 12-15-1 et seq., which governed the termination of parental rights before the enactment of the CPA, contains a complimentary provision. See Ala.Code 1975, § 12-15-65(f) ("If the court finds ... from clear and convincing evidence, competent, relevant, and material in nature that parental rights should be terminated, the court may proceed immediately, in the absence of objection showing good cause or at a postponed hearing, to make proper disposition of the case.").
In determining whether DHR has proven by clear and convincing evidence that a *481 parent is unable or unwilling to discharge his or her responsibilities, the CPA requires that the court consider several factors, including, but not limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"....
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"a. Murder or voluntary manslaughter of another child of that parent."
Ala.Code 1975, § 26-18-7(a). See also Ala.Code 1975, § 12-15-65(m).
The mother and the father argue that DHR failed to make reasonable efforts to rehabilitate them before it attempted to terminate their parental rights. The trial court did not make a specific finding regarding DHR's efforts to rehabilitate the parents, but it did determine that DHR had "made reasonable efforts toward reunification to no avail." (Emphasis added.) Thus posited, we must consider the relationship between "reasonable efforts to rehabilitate" a parent, see Ala.Code 1975, § 26-18-7(a)(6), and "reasonable efforts to reunite" a parent and a child, see Ala.Code 1975, § 12-15-65(m) and § 26-18-7(a)(1).
The father and the mother argue that this court has stated that § 26-18-7(a)(6) requires DHR to make reasonable efforts to rehabilitate a parent before seeking to terminate the parent's parental rights. See D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584, 589 (Ala.Civ.App. 1999).[4] Prior to D.S.S., however, this court also stated that "DHR has the duty to make reasonable efforts to rehabilitate [a parent] so that family reunification might be attainable." C.B. v. State Dep't of Human Res., 782 So.2d 781, 785 (Ala. Civ.App.1998) (emphasis added); see generally Miller v. Alabama Dep't of Pensions and Sec., 374 So.2d 1370, 1374 (Ala. Civ.App.1979) ("It cannot be seriously contended by the appellant in this case that every effort was not made by the state to rehabilitate her family so that it could again exercise familial rights and responsibilities toward the child in question."). In other words, reunification of the parent and the child is the overarching purpose for which "reasonable efforts to rehabilitate" must be made. It would be illogical to require DHR to make reasonable efforts to rehabilitate a parent in a case where DHR has no concomitant duty to attempt to reunite the parent and the child, or where reunification is not practicable. *482 (For example, DHR has no statutory obligation to assist a parent in overcoming a drug addiction if that parent has been convicted of murdering the child's sibling and the best interests of the child would be served by termination of the parent's parental rights. See generally Ala.Code 1975, § 12-15-65(m) (stating that DHR is required to make reasonable efforts to "make it possible for a child to return safely to the child's home," but also stating that reasonable efforts to reunite the parent and the child are not required if the parent has been convicted of murdering the child's sibling).)
We also note that, assuming that DHR has some duty to reunite a parent and a child in a particular case, what constitutes "reasonable efforts" is a fact-dependent inquiry. There is no one set of efforts that is reasonable, and thus required, under all circumstances. See generally Ala.Code 1975, § 12-15-65(m) ("In determining the reasonable efforts to be made with respect to a child, and in making such reasonable efforts, the child's health and safety shall be the paramount concern."). Instead, the efforts actually required by DHR in each case, whether the court is considering rehabilitation or reunification, depend on the particular facts of that case, the statutory obligations regarding family reunification, and the best interests of the child.
As noted above, the trial court did not make a specific finding regarding DHR's efforts to rehabilitate the parents, but instead determined "that DHR has made reasonable efforts toward reunification to no avail." (Emphasis added.) Before making this finding, the trial court noted that the mother had been convicted of manslaughter in the death of B.C.C.'s sibling and that she was incarcerated, that the father was incarcerated for various felony convictions at the time of trial, and that the father had never seen B.C.C. We also note that the record would clearly support findings that the father knew of B.C.C.'s birth, but did not seek to see the child before the father was incarcerated again (approximately five months later); that the father did not seek to visit B.C.C. during an extended period of time when he was not incarcerated, even though he knew of B.C.C.'s whereabouts; that the father did not seek custody of B.C.C. when he was specifically asked about it at the initial dependency proceeding, at which he was represented by counsel; that the father failed to seek visitation with B.C.C. at any time before the trial regarding the termination of his parental rights;[5] and that DHR had made efforts to locate the father's whereabouts during the pendency of B.C.C.'s case to no avail.[6] The evidence indicated that even the father's relatives generally did not know his whereabouts during the pendency of B.C.C.'s case. There was also evidence that both the mother and the father had used crack cocaine on a regular basis during the mother's pregnancies, that the father had *483 continued to use crack cocaine until his incarceration, and that his only attempt at rehabilitation had failed. Further, even the maternal grandmother testified that it would be in B.C.C.'s best interest to be adopted by his foster parents, whom he had resided with for two years and whom he called "mama" and "daddy."
The Alabama Legislature has stated that it is not necessary to make reasonable efforts to reunite a parent and a child if the parent has been convicted of voluntary manslaughter in the death of the child's sibling, see Ala.Code 1975, § 12-15-65(m)(2), or if the parent has abandoned his child, see Ala.Code 1975, § 12-15-65(m)(1) and § 26-18-7(a)(1).[7] The CPA defines "abandonment" to include
"a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
Ala.Code 1975, § 26-18-3(1). The CPA further provides a rebuttable presumption that a parent is unable or unwilling to discharge his parental responsibilities if the parent has abandoned his child for a period of four months preceding the filing of the petition to terminate parental rights. See Ala.Code 1975, § 26-18-7(c).
Based upon the language of Ala.Code 1975, § 12-15-65(m) and § 26-18-7 and the aforementioned evidence, and in light of the presumption that the trial court's judgment is factually correct, DHR had no duty to attempt to reunite the mother and the child. Likewise, DHR had no duty to attempt to "reunite" the father with a child whom the father had never even seen and *484 in whom the father had shown no interest, but instead had abandoned. Accordingly, we cannot conclude, under the facts of this case, that the parents' argument that DHR failed to exert reasonable efforts to rehabilitate them provides any ground for reversal.
The father and the mother next argue that DHR failed to present evidence of recent attempts to locate a viable alternative to termination of their parental rights, specifically asserting that DHR purported to shift the burden of investigating alternative-placement resources to the father's family. They also argue that custody of B.C.C. should have been granted to L.G. and R.G., who had forwarded a letter to the trial court requesting to adopt B.C.C. a few days before trial.
We note that the record supports the conclusion that DHR attempted to no avail to locate maternal relatives who were willing to assume custody of B.C.C. In regard to paternal relatives, Harriette White, a social worker with Jefferson County DHR who worked on B.C.C.'s custody case from March 1999 through January 2001, testified that at a hearing in February 2000 the father was asked whether he would like to obtain custody of B.C.C. and he responded that he was not financially able to provide for B.C.C. and that he was "not stable." Instead, as noted above, he supported a petition by a paternal great-aunt and great-uncle who resided in Alabama to obtain temporary custody of B.C.C.; a petition that the paternal great-aunt and great-uncle subsequently withdrew. Although the father stated that he and the paternal great-aunt and great-uncle were represented by the same legal counsel, at no time after the withdrawal of the temporary-custody petition did the father suggest any alternative relative placement.
White testified that after the February 2000 hearing she had discussed potential relative placements with the paternal grandmother, who resided in California, and with the father's sister. White stated that the paternal grandmother had initially indicated that she was interested in obtaining custody of B.C.C., but the grandmother did not provide additional contact information because she was in the process of moving. Instead, she told White that she should contact the attorney who had represented the Alabama paternal great-aunt and great-uncle and the father at the February hearing. According to White, the attorney informed her that he did not get a further response from the paternal grandmother and White never heard from the paternal grandmother again. Further, the father testified that the paternal grandmother was not a suitable placement resource for B.C.C.
The evidence indicates that the only other paternal relatives who had visited B.C.C. were J.B.'s sister, who had visited with B.C.C. on a few occasions but was unable to assume custody; the Alabama paternal great-aunt and great-uncle, who no longer desired custody of B.C.C.; and J.B.'s father, who at one point stated that he desired to adopt B.C.C., but then failed to provide DHR with additional requested information. In regard to L.G. and R.G., the paternal great-aunt and great-uncle who resided in California, the trial court determined that they filed a request to adopt B.C.C. only days before trial and after B.C.C. had been in DHR's custody for two years. L.G.'s request stated that they "first learned of [B.C.C.'s] existence two years ago when I was informed of his sister's sad and tragic death.... I hadn't followed up until recently." In the intervening two years, B.C.C. had formed a de facto parent-child relationship with his foster parents, who desired to adopt him and who he knew as his "mama" and "daddy." *485 The foster parents had allowed the maternal grandparents to visit with B.C.C. on a regular basis. They indicated that they planned to continue to allow the maternal grandparents to visit with B.C.C. and that they would not prevent visitation with the father and the mother if it was in the child's interest.[8]
Based on the foregoing, we cannot conclude that DHR failed to fulfill its obligation to investigate all viable alternatives to the termination of the father's and the mother's parental rights or that the trial court failed to consider and reject all viable alternatives to termination of the father's and the mother's parental rights, including L.G. and R.G. See Ex parte State Dep't of Human Res., supra; Ex parte Beasley, supra.
The judgment of the trial court is due to be affirmed.
AFFIRMED.
PITTMAN, J., concurs.
YATES, P.J., and CRAWLEY and THOMPSON, JJ., concur in the result.
CRAWLEY, Judge, concurring in the result.
I concur in the result; however, I write specially to address some concerns raised by issues addressed in notes 6, 7, and 8 of the main opinion.
I find no relevance to the reference in note 6 to the Putative Father Registry because the trial court had adjudicated J.B. to be B.C.C.'s father. Similarly, I question the relevance of note 7 because I find it without dispute that J.B. abandoned B.C.C. J.B. lost any fundamental right he had because of his abandonment of B.C.C., and, therefore, a discussion of cases involving fathers who have shown a commitment toward their children is not warranted.
I conclude that the reference in note 8 to B.C.C.'s best interest is not the proper test to be applied in this case, and I further conclude that the comparison between B.C.C.'s foster parents (I do not support the characterization of them in the main opinion as "de facto parents") and the paternal relatives who lived in California is similarly misplaced. In addressing a New York statutory procedure similar to that employed in this state,[9] the U.S. Supreme Court observed:
"The factfinding does not purportand is not intendedto balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents. The State alleges that the natural parents are at fault.... The questions disputed and decided are what the State did ... and what the natural parents did not do....
"... [A]t the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures.

*486 "However substantial the foster parents' interests may be ..., they are not implicated directly in the factfinding stage of a state-initiated permanent neglect proceeding against the natural parents."
Santosky v. Kramer, 455 U.S. 745, 759-61, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
NOTES
[1] The assistant coroner for Jefferson County testified that S.C.'s daughter died of blunt-force injuries to her head and abdomen, including a ruptured liver. According to the assistant coroner, the daughter had "at least twenty different bruises ... on the front of the chest and abdomen" in addition to bruises on her back and abrasions on her head and her back.
[2] S.C. later attempted to blame her daughter's death on her paramour, who pleaded guilty to charges of felony child abuse and was sentenced to 10 years' incarceration.
[3] The Sixth Amendment to the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall... have the assistance of counsel for his defense." (Emphasis added.) The Alabama Supreme Court has recently stated, "The Sixth Amendment right to counsel is at issue only where adversary judicial criminal proceedings have been initiated against the defendant." Ex parte Stewart, 853 So.2d 901, 903 (Ala.2002) (emphasis added); see generally McNeese v. State ex rel. Cramer, 592 So.2d 615, 617 (Ala.Civ.App.1992) (noting that the rules applicable to the admissibility of a confession in a criminal action are generally not applicable when the confession is offered in a civil action).
[4] Section 26-18-7(a) states that "[i]n determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider... (6) [whether] reasonable efforts by [DHR]... leading toward the rehabilitation of the parents have failed," and also lists other factors to be considered. Ala.Code 1975, § 26-18-7(a).
[5] As noted, by the time of trial, the child was approximately three years old. Further, the record indicates that, because of his incarceration, the father could not even be a candidate for custodian of the child for between one and three years beyond the date of the trial (depending on his behavior in prison), at which time the child would be between four and six years old.
[6] We also find it instructive that in the area of adoption and "relinquishment for adoption to [DHR]," our Legislature has adopted a policy requiring biological fathers to claim paternity in a timely manner. See Ala.Code 1975, § 26-10C-1(i). There is no evidence that the father filed a notice of paternity with the Putative Father Registry. Cf. Ala.Code 1975, § 26-10A-7(a) (providing, among other things, that "relinquishment for adoption to [DHR]" is not required of a putative father who has failed to file an appropriate notice in the Putative Father Registry).
[7] The policy considerations underlying § 12-15-65(m)(1) and § 26-18-7(a)(1) would appear to be particularly strong in a case such as this where the father has never had a substantial relationship with his child. See generally Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002). In addressing a custody dispute in R.K., we stated:

"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," Caban [v. Mohammed], 441 U.S. [380,] 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 [(1979)], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." Id., at 389, n. 7, 99 S.Ct. 1760. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in `promot[ing] a way of life' through the instruction of children ... as well as from the fact of blood relationship." Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972))."'
R.K., 843 So.2d at 781 (quoting Lehr, 463 U.S. at 261, 103 S.Ct. 2985). Similarly, in an adoption case, this court has spoken to certain fundamental principles that define the significance of a father's biological connection to a child:
"`The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.'"
M.V.S. v. V.M.D., 776 So.2d 142, 146 (Ala.Civ. App.1999) (quoting Lehr, 463 U.S. at 262, 103 S.Ct. 2985) (holding that "the natural father must have established a substantial relationship with the child to merit constitutional protection").
[8] The father would apparently have us conclude that it would be in the best interest of B.C.C. to be removed from his de facto parents, and from regular contact with maternal relatives who have continued to show an interest in his welfare, in favor of California relatives who have never seen B.C.C. and who have failed to express an interest in obtaining custody for over two years.
[9] A parental-rights-termination case is composed of two phasesan adjudicatory phase and a dispositional phase. See § 12-15-65(f) and (h), Ala.Code 1975; Y.M. v. Jefferson County Dep't of Human Res., [Ms. 2010755, Jan. 24, 2003] ___ So.2d ___ (Ala.Civ.App. 2003); and Rule 25, Ala. R. Juv. P.