MOORE, Chief Justice
(dissenting).
J.M.P. and M.G.N. appealed the juvenile court’s termination of their parental rights to six of their children, J.P., C.P., S.P., S.N., T.P., and S.J.M.P., which the Court of Civil Appeals affirmed. This Court initially granted certiorari review and now quashes the writs. I respectfully dissent. For the reasons discussed below, I would reverse the trial court’s termination of J.M.P.’s and M.G.N.’s God-given parental rights to six of their children and remand the case because I do not believe the evidence in this case rises to the level of the clear and convincing evidence required by § 12-15-319(a), Ala.Code 1975. Section 12-15-319(a) is phrased in present and future terms, and I believe the juvenile court has terminated J.M.P.’s and M.G.N.’s parental rights without clear and convincing evidence that J.M.P. and M.G.N. are currently unable to discharge their parental duties. See S.U. v. Madison Cnty. Dep’t of Human Res., 91 So.3d 716, 720 (Ala.Civ.App.2012), and D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003).

I. Facts and Procedural History

In April 2008, M.G.N., the mother, gave her son C.P. a Benadryl brand antihistamine for his allergies. She left C.P., who was four years old, at home with an adult babysitter and went to pay the rent. When J.M.P., the father, returned home, C.P. was suffering from an altered mental state or possible seizures. J.M.P. did not know that M.G.N. had given C.P. the antihistamine. A Department of Human Resources (“DHR”) caseworker testified that C.P. was unconscious and was taken to the hospital. J.M.P. took C.P. to the hospital for treatment; it is unclear whether M.G.N. was there. The hospital requested a urine screen on the child, which the parents refused. The hospital wanted to admit C.P. for observation overnight, but the parents also refused to leave C.P. J.M.P. and M.G.N. left the hospital with C.P. against medical advice.
The hospital provided DHR a report about C.P.’s condition and the parents’ refusal to allow a drug screen. Amy Marcus, a child-protective-services worker, was assigned to investigate. Marcus investigated the family home the following afternoon. At the time, the family lived in a two-bedroom, two-bathroom, single-wide mobile home that they were renting. When Marcus arrived, she found the children J.P., C.P., S.P., and S.N., ages five, *293 four, three, and two, respectively.[5] The children did not seem to have been bathed in a day or so, and their teeth appeared decayed. The children all were dirty, wearing sagging, dirty-looking diapers and carrying bottles. The diapers appeared to have been worn for some length of time, though none of the children appeared to have a diaper rash. Marcus noted that the house was not clean and that the food supply was insufficient. J.M.P. stated that he had just been paid and could obtain groceries.
M.G.N. was present when Marcus was there and in an agitated state. Marcus described M.G.N. as “very high strung” and said that she appeared to be under the influence of drugs. M.G.N. related that she had not been at the hospital with C.P. and that J.M.P. had not known she had given C.P. the antihistamine. J.M.P. corroborated M.G.N.’s story about her giving C.P. the medication without his knowledge. Marcus discovered that one of the bathrooms in the mobile home was not operational and the entrance was blocked by a sofa. The bathroom had only recently malfunctioned, and the couple had requested maintenance to fix it. The other bathroom toilet had to be flushed by hand. The stove and refrigerator were working.
Marcus returned to the DHR office and discussed the condition of the mobile home and the mother’s appearance with her supervisor. Marcus returned the following day and asked M.G.N. to undergo a drug screen. M.G.N. refused and said she wanted to contact her attorney. Marcus left the mobile home, discussed the matter further with her supervisor, and concluded that the children needed to be removed from the home. Thereafter, Marcus contacted M.G.N. by telephone and informed her of the decision to remove the children from their home. M.G.N. refused to have her children placed with any relatives and asked Marcus to come back later when she would cooperate. Because of M.G.N.’s noncompliance with Marcus, DHR petitioned the juvenile court for custody of the children, alleging that M.G.N. was using drugs and that the home was not stable or clean. M.G.N., who initially stated that she had taken an energy pill that resulted in her “high strung” appearance, admitted later to using marijuana and methamphetamine.
Upon learning that M.G.N. had refused the drug test, J.M.P. left the mobile home with their children and went to the home of his adult son’s mother, where the children would have sufficient room and would also be safe. J.M.P. was unaware that M.G.N. was using methamphetamine while caring for their children because she did not use the drugs in front of him. J.M.P. returned the children to the mobile home after DHR contacted him and advised him that he would be arrested if he did not do so. On April 23, 2008, the court awarded the Mobile County DHR custody of the minor children J.P., C.P., S.P., and S.N.
DHR took J.P. and C.P. to the hospital to be tested for exposure to methamphetamine, because Marcus had observed a propane tank and other items outside the trailer. J.M.P. testified the propane tank was used to heat his truck and that the other items were used in his work as a painter. Marcus did not find a methamphetamine lab, but DHR was still concerned about the children’s possible exposure to methamphetamine. The children’s drug screens returned negative. J.P. and C.P., who were five and four years old, *294 respectively, were diagnosed with Fragile X syndrome;[6] they were nonverbal, had large bruises on their heads, and were being bottle-fed. J.P. and C.P. banged their heads and arms against the vehicle DHR used to transport them upon removing them from their mobile home, which may have led to the bruising and bleeding in J.P.’s case. DHR completed an initial abuse and neglect report for the children. The children were “indicated” for “other risk of serious harm” as a result of inadequate supervision and inadequate food. DHR never alleged that either M.G.N. or J.M.P. abused the children, physically or otherwise.
DHR admitted all the children to foster care on April 23, 2008. DHR’s initial permanency plan was “return to parent.” J.M.P. and M.G.N. were required to be drug-free, to find suitable housing for the children, and to provide for the basic needs of the children. To help achieve those goals, DHR offered the parents random drug screens, drug assessments, and drug treatment. M.G.N. was assessed in March 2009. After M.G.N.’s drug assessment, which recommended that she receive intensive outpatient drug treatment, M.G.N. enrolled in AltaPointe Health System’s Gateway Drug Treatment Center on June 30, 2010, which involved methadone treatment. M.G.N. was still enrolled in Gateway one week before the termination hearing. M.G.N. was compliant with every aspect of her treatment. She tested positive for methadone, but she is enrolled in a methadone-based treatment program. She receives regular drug screens as part of her treatment program. At the time of the termination hearing, she had been seeing a psychologist for drug and other problems for almost two years.
J.M.P. tested positive for methadone. DHR offered him random drug screens, medical care, and a drug assessment. The assessment recommended random drug screening for J.M.P., but did not recommend formal treatment. J.M.P. took some random drug screens but refused others. He refused one drug screen in May 2009, before his paternity was established for the children.[7] J.M.P. was assessed in September 2009, which was the last drug screen before the termination hearing. J.M.P. missed a drug screen in April 2010 because he was not present at an individualized service plan (“ISP”) meeting.
DHR offered J.M.P. medical treatment as an alternative to methadone for a painful cyst on his arm, because he used methadone for pain management in order to work. He received medical treatment but continued to use methadone. A DHR worker encouraged J.M.P. to undergo drug treatment to stop using methadone. J.M.P. later voluntarily enrolled in the Gateway drug-treatment program in July 2010 in order to formally obtain methadone. J.M.P. remained enrolled in the Gateway drug-treatment program until February 2011, when he was incarcerated as the result of some outstanding traffic tickets. At the time of the termination hearing, J.M.P. was no longer enrolled in the methadone program.
DHR assisted the family in trying to acquire housing. DHR workers provided limited assistance in this regard. DHR referred the family to Section 8 housing. The Housing Authority of the City of Mobile refused to give the couple an application. Keri Lett, a social worker, contacted the Housing Authority and learned that there was a freeze on benefits. Lett ad *295 mitted that J.M.P. and M.G.N. did not have a chance with the Housing Authority. Lett gave them an application for a low-income apartment. Lett did not help M.G.N. fill out the application and did not think she was capable of filling it out. J.M.P. and M.G.N. did not ask for Lett’s help and, to her knowledge, did not complete the application. However, M.G.N. testified she did apply for the apartment. M.G.N. and J.M.P.’s credit ratings were so poor that they could not get an apartment or a rental home. J.M.P. and M.G.N. had lived with several relatives and friends after they left the mobile home. J.M.P. and M.G.N. had relocated at least 10 times in almost 4 years. The couple lived in a camper trailer, which they moved to three different locations until they obtained a house in November 2011. The couple notified Lett each time they moved the camper trailer. They had lived in the camper trailer on a relative’s property for eight months before moving into a house on the same property.
J.M.P.’s relatives own the three-bedroom house they are now living in. M.G.N. gave Lett their address at the new house on December 12, 2011. J.M.P. pays electricity and water but does not pay rent. On January 18, 2012, Lett conducted an unannounced “pop-up” visit at J.M.P. and M.G.N.’s new house, a few days before the termination hearing. M.G.N. informed Lett that she was not ready for her to see the whole house. Lett was unable to view the entire house because items were stored in several rooms, and she was unable determine whether the house was suitable for the children. J.M.P. testified that the house would provide the children a safe and stable place to live. At the hearing, M.G.N. offered equivocal testimony as to whether the house was large enough for all the children. However, M.G.N. testified that they would be able to move out the stored items to make room for the children.
DHR workers told J.M.P. and M.G.N. that they would have to work in order to demonstrate that they could care for the children financially. J.M.P. has worked during the pendency of this case, though inconsistently. An ISP report indicated that one of J.M.P.’s strengths is that he works hard to provide for the children. He works both as a painter and doing odd construction jobs. At times, his jobs have been very good. He does electrical, plumbing, drywalling, painting, and remodeling. J.M.P.’s income ranges from $200 to $2,000 per job,'depending on the type and length of job. J.M.P. also receives food stamps.
M.G.N. does not work. She states that she could not work because she does not have identification. M.G.N. has had difficulty obtaining any identification because her name is not on her birth certificate. Lett provided M.G.N. with information about how to acquire proper identification. M.G.N. made unsuccessful attempts to obtain a proper birth certificate. She does have a birth certificate that was stamped “limited usage only.” M.G.N. depends on J.M.P. as her primary source of monetary support. At the time of the termination hearing, M.G.N. was also receiving $170 in food stamps each month.
J.M.P. completed parenting classes and had J.P. and C.P.’s Fragile X syndrome explained to him. He believes that J.P. and C.P. would require extra care beyond M.G.N.’s care because of their condition. J.M.P. had difficulty placing J.P. and C.P. on Supplemental Security income prior to DHR’s involvement. He also had difficulty obtaining food stamps because he is self-employed and has no standard proof of income.
DHR provided visitation for J.M.P. and M.G.N. and all the children. During these *296 times, both parents interacted appropriately with the children with affection and care. The children also were affectionate and warm to both parents. However, the parents did not interact much with J.P. and C.P., who have Fragile X syndrome. Up until April 2010, the parents had visitation twice a month with their children at non-DHR locations, including local parks and McDonald’s fast-food restaurants. J.M.P. and M.G.N. did not cause any issues or problems during most of the visitations. However, Lett testified that S.N. and S.P.’s therapist sat in during one visitation. Lett stated that “it was told to [S.P.] to say that you want to live with the foster parent who she’s with now, so that [the children] could continue to see [the parents].”
In April 2010, the parents had visitation with their children at a McDonald’s fast-food restaurant. Apparently, the foster parents would not allow J.M.P. to buy a meal for J.P., who had been misbehaving, or for S.P. and S.N., because the foster parents had prepared snacks for them. The children became upset when they did not get a meal at McDonald’s. J.M.P. became angry and used profanity in front of his children and the foster parents. At the April 2010 ISP meeting, the team decided to decrease J.M.P. and M.G.N.’s visitation to once per month and to hold the visitation at the DHR facility. The ISP team made that decision based upon the incident at the McDonald’s fast-food restaurant and the parents’ slow progress.
J.M.P. and M.G.N. did not provide significant financial assistance to their children during the pendency of this case. They regularly brought snacks and gifts during visitations. They would also bring cakes and cookies for birthdays and holidays. They also brought Christmas presents. After S.J.M.P. was born, the parents provided her with clothes and formula when she was placed with M.G.N.’s sister.
DHR investigated M.G.N.’s relatives as placement resources for the children and placed an older child with her brother D.P. M.G.N.’s sister, T.B., had taken custody of S.J.M.P. shortly after the child was born in September 2010. S.J.M.P. was with her aunt for about six months until a background check was completed that revealed that T.B. had prior criminal charges for drug use. S.J.M.P.’s placement was not renewed with T.B. M.G.N.’s mother was not available as a resource because her husband would not submit to a background check.
DHR investigated J.M.P.’s relatives as placement resources as well. Lett stated that J.M.P.’s sister, S.G., was terminally ill with cancer and was not ready to take the children. However, M.G.N. testified that S.G.’s cancer was in remission then and was still in remission. J.M.P.’s sister and niece were to take the children S.P. and S.N., but both placements fell through.
DHR changed the permanency plan for the children from return to parent to termination of parental rights on May 19, 2009. Lett testified that the parents did not make sufficient progress in DHR’s assessment to warrant the children being returned to their care. DHR stopped giving the parents drug screens in 2010 once the permanency plan changed to termination of parental rights. On March 16, 2010, DHR filed petitions to terminate the parental rights of J.M.P. and M.G.N. as to six of their children. On January 24, 2012, the juvenile court held a hearing for the matter. On April 25, 2012, the juvenile court entered orders terminating the parental rights of M.G.N. and J.M.P. to six of their children. The parents appealed to the Court of Civil Appeals, which affirmed the orders of the juvenile court on March 29, 2013. J.M.P. and M.G.N. both filed *297 petitions for a writ of certiorari with this Court, which granted the writs on June 5, 2013.
J.M.P. and M.G.N. contend that the orders of the juvenile court and the judgment of the Court of Civil Appeals conflict with Alabama cases that require that the termination of parental rights must be supported by clear and convincing evidence. As to each of the children, the juvenile court found by clear and convincing evidence “competent, material, and relevant in nature” that,
“[sjubsequent to the original finding of dependency [DHR] made all reasonable efforts to promote reunification by offering numerous services to the parents, including assistance with housing, assistance with drug dependency, parenting classes, visitation, evaluation of possible relative placement, and other services. “That reunification efforts failed because of the failure or refusal of the parents to accept services and to amend their circumstance for the best interest of the child and to place themselves in a position to reclaim custody of the child.”
J.M.P. and M.G.N. argue that DHR did not present clear and convincing evidence to the juvenile court and that, therefore, the juvenile court’s orders terminating their parental rights are erroneous. They also argue that DHR did not use reasonable efforts to reunite them with the children and to prevent the termination of their parental rights. Because I agree with them, I must dissent from quashing the writs.

II. Standard of Review

“‘The ore tenus rule applies in cases involving termination of parental rights. When the evidence is presented ore tenus, the judgment of the trial court is “presumed correct and will be set aside only if the record reveals the judgment to be plainly and palpably wrong.” ’ ” Ex parte J.R., 896 So.2d 416, 423 (Ala.2004) (quoting G.D.M. v. State, 655 So.2d 1020, 1022 (Ala. Civ.App.1995)). “[The ore tenus] rule does not relieve this Court of its responsibility to ensure that those facts clearly and convincingly warrant the termination of parental rights.” Ex parte T.V., 971 So.2d 1, 9 (Ala.2007). The clear-and-convincing standard requires “an exacting level of certainty based on evidence of the parent’s current situation.” Id. (emphasis added). This Court does “ ‘ “not sit in judgment of the facts,” ’ ” but “ ‘ “review[s] the factfin-der’s determination of facts only to the extent of determining whether it is sufficiently supported by the evidence, that question being one of law.” ’ ” Id. (quoting Hinds v. Hinds, 887 So.2d 267, 272-73 n. 2 (Ala.Civ.App.2003)).

III. Analysis

A. The Source of Parental Rights

God, not the state, ordained the institution of the family. “The law recognizes that a higher authority ordains natural parenthood, and a fallible judge should disturb the relationship thus established only where circumstances compel human intervention.” Ex parte Sullivan, 407 So.2d 559, 563-64 (Ala.1981). Likewise,
“[t]he laws of nature teach us that the relation of parent and child is sacred, that the welfare of the child is conserved by the cultivation and promotion of that affection which should exist between parent and child, and that as a general proposition no one can watch over the growth and development of the child as a loving father or mother can and will.”
Montgomery v. Hughes, 4 Ala.App. 245, 247, 58 So. 113,113-14 (1911).
Current members of this Court have likewise addressed the divine source of parental rights. Justice Parker has opined:
*298 “God, not the state, has given parents these rights and responsibilities, and, consequently, ... courts should interfere as little as possible with parental decision-making, instead deferring to parental authority whenever it has not been fundamentally compromised by substantial neglect, wrongdoing, or criminal act.”
Ex parte G.C., 924 So.2d 651, 677-78 (Ala. 2005) (Parker, J., dissenting). Justice Parker explained that “the law recognizes that parental authority is ordained by God as a governing sphere distinct from that of the state and, consequently, that parents or guardians, not state officials or courts, generally know what is best for, and act in the best interest of, their children.” Id. at 686.
Justice Stuart has stated that “[c]hildren are a gift from God. They need and deserve the love and support of both their mothers and their fathers. Parents have God-given rights concerning their children, which are and should be protected by state government.” 924 So.2d at 661 (Stuart, J., concurring specially) (footnote omitted). Justice Bolin has also noted “that parents have a God-given right and responsibility to rear their children and that they should be allowed to do so unfettered by state interference.” 924 So.2d at 667 (Bolin, J., concurring specially).

B. The Termination of Parental Rights

Alabama is a common-law state, § 1-3-1, Ala.Code 1975, but “ ‘[proceedings to terminate parental rights were unknown at common law.’ ” Ex parte C.V., 810 So.2d 700, 720 (Ala.2001) (Johnstone, J., concurring specially) (quoting In re Termination of Parental Rights of P.A.M., 505 N.W.2d 395, 397 (S.D.1993) (emphasis added)). Therefore, “because the termination of parental rights is purely statutory, statutes governing the termination of parental rights must be strictly construed.” Id. (emphasis added). Like adoption, the termination of parental rights is a process “‘created by the state acting as parens patriae, the sovereign parent. Because the exercise of sovereign power involved in [termination] curtails the fundamental parental rights of the natural parent, the ... statutes must be closely adhered to.’” Sullivan, 407 So.2d at 563 (quoting Davis v. Turner, 337 So.2d 355, 360 (Ala.Civ.App.l976)(emphasis added)).
Alabama’s Juvenile Justice Act, § 12-15-101 et seq., Ala.Code 1975, has these overriding goals: “To preserve and strengthen the family of the child whenever possible” and “[t]o reunite a child with his or her parent or parents as quickly and as safely as possible when the child has been removed from the custody of his or her parent or parents,” “with a preference at all times for the preservation of the family.” § 12 — 15—101(b)(l),(3), and (8), Ala. Code 1975. We have said before that “the intent of the Juvenile Justice Act is not punitive but rehabilitative.” Ex parte S.F.R., 598 So.2d 1006, 1008 (Ala.1992).
The Juvenile Justice Act enumerates the circumstances in which a juvenile court may terminate parental rights:
“If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
§ 12-15-319(a), Ala.Code 1975. The Court of Civil Appeals has explained the *299 twofold evidentiary requirement of the statute:
“Because the statute is phrased in present and future terms, a juvenile court may terminate a parent’s parental rights only if clear and convincing evidence shows that the parent is currently unable to discharge his or her parental duties properly ... and that the conduct or condition that prevents the parent from assuming or exercising proper care will likely persist in the foreseeable future.”
S.U. v. Madison Cnty. Dep’t of Human Res., 91 So.3d 716, 720 (Ala.Civ.App.2012) (emphasis added) (citing D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 489, 444 (Ala.Civ.App.2003) (“[T]he existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.”)).
Further, “without evidence as to the parent’s present ability to care for [the children] and existing conditions of her home and life style, there can be no ‘clear and convincing’ evidence that the children’s best interests would be served by terminating the parent’s parental rights.” Hamilton v. State, 410 So.2d 64, 66 (Ala. Civ.App.1982) (emphasis added). “Clear and convincing evidence” is defined elsewhere in the Alabama Code as “[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.” § 6 — 11—20(b)(4), Ala.Code 1975.[8]
“In determining whether ... to terminate the parental rights, the juvenile court shall consider the following factors including ...:
[[Image here]]
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources.”
§ 12-15-319(a)(7) and (12). “Reasonable efforts” are
“efforts made to preserve and reunify families prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the home of the child, and to make it possible for a child to return safely to the home of the child. In determining the reasonable efforts to be made with respect to a child, and in making these reasonable efforts, the health and safety of the child shall be the paramount concern.”
§ 12 — 15—312(b), Ala.Code 1975. “[R]euni-fication of the parent and the child is the overarching purpose for which ‘reasonable efforts to rehabilitate’ must be made.” J.B. v. Jefferson Cnty. Dep’t of Human Res., 869 So.2d 475, 481 (Ala.Civ.App. 2003). Moreover, “DHR has the duty to make reasonable efforts to rehabilitate the [parents] so that family reunification might be attainable.” C.B. v. State Dep’t of Hu *300 man Res., 782 So.2d 781, 785 (Ala.Civ.App. 1998).

C. Whether DHR Presented Clear and Convincing Evidence

DHR provided three reunification goals for J.M.P. and M.G.N.’s family: 1) to be drug-free, 2) to find suitable housing, and 3) to be able to provide for their children’s needs. DHR caseworkers addressed those goals with the parents during ISP meetings. DHR argues that the parents did not cooperate sufficiently in attaining those goals to warrant reunification. However, between late 2010 and late 2012, J.M.P. and M.G.N. sought to address each of their ISP goals. The record reflects that, at the time of the termination hearing, J.M.P. and M.G.N. had either accomplished or made significant progress on all three goals.

1. Drug-Free

Juvenile courts may consider a parent’s “excessive use of alcohol or controlled substances” in determining whether to terminate parental rights. § 12-15-319(a)(2), Ala.Code 1975. The juvenile court found that DHR here “made all reasonable effort to promote reunification by offering numerous services to the parents, including ... assistance with drug dependency.”
Although DHR did offer services to the parents, DHR did not provide clear and convincing evidence that the parents’ current conduct involved the use of drugs or had risen to the “excessive use of ... controlled substances” that the court might consider as a factor for terminating parental rights. Before the termination hearing in January 2012, J.M.P.’s last drug screen was in September 2009. M.G.N.’s last positive drug screen occurred approximately three years before the termination hearing. M.G.N. remained in a drug-treatment program at the time of the hearing and remains subject to random screens in the program. M.G.N.’s decision to continue the drug-treatment program should not count as a strike against her but as a positive indication of M.G.N.’s efforts to comply with DHR’s reunification goals.
In addition, J.M.P.’s drug assessment recommended only drug screens and not any formal treatment for a drug problem. Nonetheless, J.M.P. voluntarily started the Gateway program for methadone treatment. However, J.M.P. was unable to complete the program after he was incarcerated for outstanding traffic tickets. According to J.M.P., he has been drug-free since his release from jail.
In view of the two-year vacuum of evidence pertaining to the parents’ drug use, apart from legally obtained methadone, and the lack of any negative testimony regarding the effect of M.G.N.’s drug-rehabilitation efforts, the record simply does not contain sufficient evidence from which the juvenile court could have been convinced that M.G.N. and J.M.P. suffer from “excessive use of alcohol or controlled substances” as a current condition or exhibit drug-use conduct that would prevent them from caring properly for their children. See M.G. v. Etowah Cnty. Dep’t of Human Res., 26 So.3d 436, 443 (Ala.Civ.App.2009) (“[Gjiven the lack of any negative testimony regarding the effect of the mother’s drug-rehabilitation efforts, the record does not contain evidence from which the juvenile court reasonably could have been clearly convinced that the mother suffers from an ongoing drug-addiction ‘condition’ or exhibits drug-use ‘conduct’ that prevents her from properly caring for her children.”).

2. Suitable Housing

The Juvenile Justice Act provides that “[njegligent treatment or maltreatment of a child” includes “the failure to provide *301 adequate ... shelter.” § 12-15-301(7), Ala. Code 1975. DHR maintains that the parents did not sufficiently comply with its efforts to address housing for the children. The juvenile court found that DHR had made “all reasonable efforts to promote reunification by offering numerous services to the parents, including assistance with housing.”
The Juvenile Justice Act defines “reasonable efforts” as
“efforts made to preserve and reunify families ... and to make it possible for a child, to return safely to the home of the child. In determining the reasonable efforts to be made with respect to a child, and in making these reasonable efforts, the health and safety of the child shall be the paramount concern.”
§ 12-15-312(b), Ala.Code 1975 (emphasis added). One factor the juvenile court may consider is “[t]hat reasonable efforts by [DHR] ... leading toward the rehabilitation of the parents have failed.” § 12-15-319(a)(7), Ala.Code 1975. However, it should be self-evident that DHR’s efforts must be “reasonable” before the juvenile court may find that such efforts failed to achieve rehabilitation of the parents and reunification.
“Reasonable efforts” in regard to housing must make it possible for the children to return safely to a home with their family. § 12-15-312. Here, Section 8 housing was impossible because of a “freeze” on benefits.[9] Lett provided M.G.N. an application for a low-income apartment but did not think that M.G.N. could complete the application on her own. J.M.P. and M.G.N.’s poor credit ratings precluded the possibility of renting a home. DHR’s efforts to assist in locating housing for the parents offered only impossibilities. The services DHR provided did not “make it possible” for the children to return safely to a home with their parents. Where a return home is not even a possibility for the family, DHR’s efforts cannot be said to constitute clear and convincing evidence of “reasonable efforts ... leading toward the rehabilitation of the parents.” § 12-15-319(a)(7).
In spite of DHR’s lack of efforts to “make it possible for [the] children] to return safely to the home,” J.M.P. and M.G.N. had obtained housing through relatives, without DHR’s help. In the second week of December 2011, M.G.N. provided DHR with the address for their new home. On January 18, 2012, after waiting more than a month, Lett conducted a surprise “pop-up” visit to the new home. This “pop-up” visit occurred less than a week before the termination hearing. Understandably, M.G.N. was not prepared for a surprise DHR visit. She did not allow Lett to see the whole house because J.M.P.’s associates had items stored in other rooms. With the impending termination hearing, Lett was evidently unable to conduct a full home study before the hearing.
J.M.P. and M.G.N. had lived in their new house for about two months before the termination hearing. However, they also achieved a measure of stability by living at the same location for over 10 months. The parents lived on the same property, albeit in a small camper trailer, for eight months before moving to the house. Although the record indicates that the family’s new home was the subject of litigation over the property, the record lacks clear and convincing evidence indicating that the house lacked working utili *302 ties, an adequate food supply, and a measure of cleanliness. The record also does not indicate whether the litigation would have any impact on J.M.P. and M.G.N.’s renting the home. The new home has three bedrooms, which would provide separate bedrooms for the boys, the girls, and the parents.
In conclusion, I believe the record does not contain clear and convincing evidence from which the juvenile court could have concluded that the parents’ current home would be unsuitable for the needs of the children.

3. Provide for Children’s Needs

DHR told the parents that they would have to work in order to demonstrate they could care for the .children financially. In a termination-of-parental-rights proceeding, a juvenile court may consider the “[flailure by the parents to provide for the material needs of the child ... where the parent is able to do so.” § 12-15-319(9), Ala.Code 1975 (emphasis added). The language of this subsection requires the court to view “the parents” as a unit and as individuals, rather than pitting the mother’s failure to work against the father’s relatively consistent work history.
At the time of the termination hearing, J.M.P. was working, and, indeed, he has worked throughout the pendency of DHR’s involvement with the family. DHR workers agreed that providing for the family was one of J.M.P.’s strengths. J.M.P. worked consistently when work was available. His income ranged from $200 to $2,000 per job, depending on the type and length of the particular job. M.G.N., however, has not worked outside the home. The fact that J.M.P., as the father, has worked to provide for his children and M.G.N. while M.G.N. has fulfilled the role of stay-at-home mother should not be a criterion for taking away wanted children from either the father or the mother. See In re Hickman, 489 So.2d 601, 602 (Ala. Civ.App.1986) (“Such inability was not due to failure of the father to work. He was ... nearly always employed in construction work but earning very low wages.”).
DHR presented no evidence indicating that the parents would be unable to properly clothe, feed, shelter, or educate their children based on J.M.P.’s income and supplemental government benefits. See M.G., 26 So.3d at 444 (“[T]he mere fact that the mother has only a limited income and must improvise to provide for the children due to financial constraints does not render her unable to properly care for the children.”). The record here does not contain clear and convincing evidence from which the juvenile court could have held that the income from J.M.P.’s work and supplemental government benefits would not provide, in the future, for the needs of the children.
As far as caring for, clothing, and feeding the children, J.M.P. admitted that he and M.G.N. would need assistance if they regained custody. M.G.N. also testified that she could not care for her children alone. She knew she would need J.M.P.’s assistance to care for them. However, acknowledging the need of assistance to care for one’s children is vastly different than being unable to care for them.
There is a dearth of evidence, let alone clear and convincing evidence, in the record regarding J.M.P.’s and M.G.N.’s current unwillingness and inability to care for their children. I have “searched the record in vain for any evidence as to the current inability or. unwillingness on the part of the parents to properly care for their children, or any evidence relating to the present condition of their home and lifestyle.” Wilson v. State Dep’t of Human Res., 527 So.2d 1322, 1325 (Ala.Civ. App.1988) (Holmes, J., concurring specially) (some emphasis added). Because I *303 believe the juvenile court terminated J.M.P.’s and M.G.N.’s parental rights without clear and convincing evidence of their current conditions and their current inability or unwillingness to effectively parent their children, I would hold that the judgments of the juvenile court are erroneous.

D. Reasonable Efforts

J.M.P. and M.G.N. also argue that DHR did not use reasonable efforts to reunite them with their children and thus to prevent the termination of their parental rights. DHR counters by maintaining that J.M.P.’s and M.G.N.’s parental efforts were virtually nonexistent until DHR sought to terminate their parental rights. Alabama’s Juvenile Justice Act requires that both DHR and the parents expend their efforts of rehabilitation to reunify families. As noted above, DHR’s “reasonable efforts” are “efforts made to preserve and reunify families ... and to make it possible for a child to return safely to the home of the child.” § 12-15-312(b). Juvenile courts may consider a “[l]ack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with [DHR] agreements.” § 12-15-319(12), Ala.Code 1975. The Juvenile Justice Act “contemplates that a parent’s actual lack of effort is to be considered in relation to a reasonable reunification plan that is already in place.” H.H. v. Baldwin Cnty. Dep’t of Human Res., 989 So.2d 1094, 1107 (Ala.Civ.App.2007).
Parental-rehabilitation plans must be specifically tailored to the particular problems that prevent proper parenting.
“The natural starting point in any fair and serious attempt to rehabilitate the parent and to reunite the parent with the child is identification of that characteristic, conduct, or circumstance that renders the parent unfit or unable to discharge his or her parental responsibilities to the child. Once DHR identifies the source of parental unfitness, the overarching goal of family reunification requires DHR to communicate its concerns to the parent and to develop a reasonable plan with the parent that is tailored toward the particular problem(s) preventing the parent from assuming a proper parental role.”
989 So.2d-at 1105 (emphasis added).
Here, DHR developed a plan and tailored the plan by identifying three particular problems. The plan required J.M.P. and M.G.N. to address drug use, housing, and providing for the children. DHR argues that the parents’ “purported efforts to cooperate with reunification plans were not sufficient enough to warrant the return of the child[ren].” DHR maintains that “the parents failed to address the issues that inhibited the ability to effectively parent their children.” DHR characterizes their work as “ ‘last-minute efforts undertaken in anticipation of the impending termination-of-parental-rights trial’ and thus insufficient to warrant reunification.” (Quoting A.M.F. v. Tuscaloosa Cnty. Dep’t of Human Res., 75 So.3d 1206, 1213 (Ala. Civ.App.2011).)
Even if J.M.P.’s and M.G.N.’s efforts to “adjust [their] circumstances to meet the needs of the children] in accordance” with DHR agreements were nonexistent until DHR filed for the termination of then-parental rights, which was not the case, the juvenile court must still consider J.M.P.’s and M.G.N.’s recent and current efforts as evidence of their current conditions. Courts must not forget the goals of Alabama’s Juvenile Justice Act, among which is: “To preserve and strengthen the family of the child whenever possible” and “[t]o reunite a child with his or her parent or parents as quickly and as safely as possible when the child has been removed from the custody of his or her parent or *304 parents,” “with a preference at all times for the preservation of the family.” § 12-15 — 101(b)(1), (3), and (8), Ala.Code 1975 (emphasis added). “[T]he intent of the Juvenile Justice Act is not punitive but rehabilitative.” Ex parte S.F.R., 598 So.2d 1006,1008 (Ala.1992).
Given the express goals of Alabama’s Juvenile Justice Act, courts may not turn a blind eye when parents demonstrate significant efforts to “adjust [their] circumstances to meet the needs of the children]” quite apart from agreements with DHR. § 12-15-319(12). The Court of Civil Appeals stated: ‘“Generally, a parent who has been deprived of custody of his child on account of his misconduct is entitled to restoration of custody on a showing that he has reformed and is presently a suitable custodian.’ ” State Dep’t of Pensions & Sec. v. Hall, 57 Ala.App. 290, 293, 328 So.2d 295, 298 (Civ.App.1976) (quoting 59 Am.Jur.2d. Parent and Child § 39).
J.M.P.’s and M.G.N.’s reformation and rehabilitation, though not complete, consisted of more than just an uncertain promise on the eve of the termination hearing. Indeed, from 2010 to 2012, the parents made significant efforts to address the three major issues that were inhibiting their abilities to effectively parent their children. Where J.M.P. and M.G.N. have made significant efforts at rehabilitation and reformation to meet the needs of their children, I believe we should not consider their prior “lack of effort to adjust [their] circumstances ... in accordance with agreements reached with [DHR]” as a factor in the termination of their parental rights. See § 12-15-319(12), Ala.Code 1975.
Moreover, as explained supra, I believe that DHR’s efforts did not constitute “reasonable efforts.” “[A] juvenile court commits reversible error when it terminates parental rights based on an erroneous finding that DHR used reasonable efforts to reunite a parent with his or her child.” H.H., 989 So.2d at 1108-09. I would hold that the juvenile court committed reversible error by terminating J.M.P.’s and M.G.N.’s parental rights where DHR did not make reasonable efforts to reunite these parents with their children.

E. Viable Alternatives to Termination of Parental Rights

Termination of parental rights is governed by a two-pronged test:
“‘First, the trial court must conclude from clear and convincing evidence that the child is dependent.... Second, the court must consider and reject all other viable alternatives to termination of parental rights, so that it can conclude that the termination is in the child’s best interests.’ ”
R.L.B. v. Morgan Cnty. Dep’t of Human Res., 805 So.2d 721, 724 (Ala.Civ.App.2001) (quoting H.M.W. v. Mobile Cnty. Dep’t of Human Res., 631 So.2d 1049, 1050 (Ala. Civ.App.1993)). The Juvenile Justice Act defines a dependent child as, among other things, one “[w]ithout a parent ... willing and able to provide for the care, support, or education of the child” or one “[w]hose parent ... is unable or unwilling to discharge his or her responsibilities to and for the child.” § 12-15-102(8)2. and (8)6., Ala.Code 1975.
Because I would hold that DHR did not present the juvenile court with clear and convincing evidence that J.M.P. and M.G.N. are currently unwilling and unable to provide for the care, support, or education of the children, or otherwise to discharge their parental responsibilities, I would likewise hold that their children are not “dependent” children as defined by the Juvenile Justice Act. My conclusion would render unnecessary a discussion whether *305 the juvenile court considered and rejected all viable alternatives to the termination of J.M.P. and M.G.N.’s parental rights.

IV. Conclusion

I would hold that the evidence in this case does not rise to the level of clear and convincing evidence so as to support the termination of J.M.P.’s and M.G.N.’s parental rights, “such action being the last and most extreme disposition permitted by-statute.” D.O., 859 So.2d at 445. Although J.M.P and M.G.N. have by no means been perfect parents, their natural right to be parents has not been fundamentally compromised or abandoned by substantial neglect, wrongdoing, or criminal acts. Their case is not among “the most egregious of circumstances” that might justify a court’s decision to dismantle a family and “strike[ ] at the very heart of the family unit.” Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990).
For the reasons stated above, I would reverse the Court of Civil Appeals’ affir-mance, in effect reversing the judgments of the juvenile court terminating J.M.P.’s and M.G.N.’s parental rights to six of their children, and remand the case for further proceedings consistent with this opinion. I therefore dissent.

. T.P. and S J.M.P. were both born during the dependency proceedings. T.P. was placed with M.G.N.'s sister.

. J.M.P.’s paternity has been established for J.P., C.P., S.P., S.N., and T.P. SJ.M.P. has not had DNA testing.

. The Court of Civil Appeals applies the definition of clear and convincing evidence from § 6-11 — 20(b)(4) in termination-of-parental-rights cases. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1184 (Ala.Civ.App. 2007); and L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002).

. The record does not indicate whether this “freeze” on Section 8 housing applied only to J.M.P. and M.G.N. or was a general "freeze.”