MOORE, Judge.
S.U. (“the mother”) appeals from judgments of the Madison Juvenile Court (“the juvenile court”) terminating her parental rights to her children, J.A.B. and D.A.U. (sometimes hereinafter referred to collectively as “the children”).

Procedural History

On December 6, 2010, the Madison County Department of Human Resources (“DHR”) filed separate petitions to terminate the parental rights of the mother.[1] After a July 5, 2011, trial, the juvenile court entered judgments on July 18, 2011, terminating the mother’s parental rights to the children. On July 28, 2011, the mother appealed from the judgments.

Facts

The mother gave birth to J.A.B. and D.A.U. out-of-wedlock on October 11, 2004, and June 17, 2008, respectively. According to the mother, she provided care and shelter for the children throughout their lives. The mother testified that she and J.A.B. had sometimes lived at a rescue mission or a hotel and had, at other times, stayed with the mother’s sister; she testified, however, that she had eventually obtained her own two-bedroom apartment. In the summer of 2009, the mother lived with the children and her boyfriend, L.W., in that apartment. The mother testified that, from 2005 through 2008, she had worked consistently, although for different employers, and had provided for the children from her wages. She testified, however, that she became unemployed and depended on government assistance to provide for the children in 2009. The mother testified that she and L.W. had used marijuana and cocaine, but, she said, they had both been able to properly care for the children while “high.” The mother testified that she had been investigated by DHR at some point before June 2009 for unstated reasons but that DHR had found no evidence indicating that the children were being mistreated.[2]
The mother testified that, in 2003, when she was 22 years old, she had been indicted for attempting to obtain a controlled substance through fraud.[3] As a result of that charge, the mother was referred to a drug-diversion program. The mother testified that she had repeatedly failed to report to the program and had failed to complete the steps outlined in • the pro *718 gram.[4] According to the mother, when she failed to attend a court hearing in July 2006 a warrant was issued for her arrest. On September 1, 2009, the mother and L.W. engaged in an argument that resulted in L.W.’s telephoning the local police. When the police arrived, they discovered that the mother had an outstanding arrest warrant, and they took her into custody that day.
The mother testified that, when she was arrested, she had originally left the children with L.W. or a neighbor, with the expectation that she would be released from police custody the next day. However, the mother remained in jail and ultimately pleaded guilty to the 2003 offense, after which she was sentenced to a five-year split sentence, with two years to be served in prison. The children eventually came to be cared for by D.B., a man with whom one of the mother’s sisters lived.[5] The mother did not know D.B., but the mother came to believe that D.B. was properly caring for the children based on letters he sent the mother and telephone calls they shared. In February 2010, after meeting D.B. one time at a court hearing and while she remained incarcerated, the mother wrote a letter requesting that D.B. maintain custody of the children and signed a document stating her intent that D.B. have temporary custody of the children.
Not long thereafter, D.B. reported to DHR that he needed assistance caring for the children. At that point, DHR opened an investigation, during which it discovered that D.B., who was not a licensed foster parent, did not have legal custody of the children, was living in an apartment provided by a church, and was using a bicycle for transportation. DHR removed the children from D.B.’s care. After a shelter-care hearing, DHR obtained legal custody of the children and placed them in foster care. DHR did not contact the mother at that time because it determined that it could not provide the mother with any reunification services because she was incarcerated. The mother did not visit with the children or provide any manner of support for the children while she was incarcerated.
DHR filed its petitions to terminate the parental rights of the mother on December 6, 2010, while she remained in prison. The mother moved into the Lovelady Center in Birmingham on March 10, 2011. That facility, which provides rehabilitation services for women in need, including those serving prison sentences, provides transportation for visitations between mothers housed in the facility and their children. On April 14, 2011, the mother’s attorney wrote DHR requesting visitation between the mother and the children,[6] but DHR denied the request, insisting that no visitation would be allowed absent a court order. At the time of trial, the mother was working in the kitchen at the Lovelady Center, earning $150 per week, $125 of which she used to pay rent. A letter from a representative of that facility was introduced into evidence. The letter stated that the mother had tested negative on all of her *719 drug screens and further stated: “We are proud of the process [sic] that [the mother] has made and we feel with the tools she has acquired from our program, she will be able to have a stable foundation to become a great mother and a productive member of society.”[7]
At the July 5, 2011, trial, the mother testified that her sentence would end on July 22, 2011, but that she would remain on probation for three years following the end of her prison sentence. She testified that, upon her release from prison, she planned to remain a resident of the Love-lady Center for another year in order to complete a program that would transition her back into society. As part of that program, the Lovelady Center would locate a job and suitable housing for the mother. The mother testified that the Lo-velady Center has a school and a day care and that the children could live with her at the center during her transition process. The mother testified that 400 women reside at the facility, approximately one-half of which have experienced drug problems, and that the Lovelady Center had allowed other children to stay there with their mothers. The mother testified that she intended to stay in Birmingham and not return to Huntsville because of the bad influences that would surround her if she was living there. Although she admitted that she had not previously taken her legal problems seriously, the mother testified that this time she will report to her probation officer and pay her fines. The mother admitted, however, that she had previously promised a court that she would abide by its rules, only to renege on her promise.
At the time of trial, the children were residing in their second foster-care home. The foster parent informed DHR that she did not plan to adopt the children, and DHR had not identified any other adoptive placement for the children. DHR had completed an investigation for any relative resource, but it had found no suitable or willing relative to take custody of the children.
In separate judgments, the juvenile court determined that the mother was unable or unwilling to discharge her parental responsibilities to and for the children and that the conduct or condition that prevented her from properly caring for the children was unlikely to change in the foreseeable future. The juvenile court specifically found:
“At the hearing on termination of parental rights, the mother avowed that she has changed her ways, that she has reformed, and that she will be an effective parent if given further opportunity to do so. The mother’s history belies those statements, however. She previously agreed to abide by the conditions of the [drug-diversion program], but failed to do so. After having evaded arrest for approximately three years, when she was finally taken into custody as a result of her failure to comply with the conditions of that program, the mother again asserted that, if given another chance, she would do all that was required of her. The Court finds her representations lacking in credibility, based upon her prior history.
“The mother is presently serving the remainder of her custodial sentence at the Lovelady Center.... The mother expressed her belief that it would be in the best interests of the [children] for them to be uprooted from their present foster home and placed in that residen *720 tial rehabilitation facility with her, in Jefferson County. The Court disagrees.
“The mother also expressed an intention to obtain stable suitable housing to meet the needs of her children and the intention to obtain stable, suitable employment to meet their financial needs. The mother’s history of minimal employment, unstable housing and failure to comply with court orders suggests the contrary, however. The Court does not believe that it would be in the best interests of the [children] to be placed in a residential group home rehabilitation facility pending the mother’s efforts to obtain housing and employment.”

Issues

On appeal, the mother argues that the judgments terminating her parental rights should be reversed because the record contains insufficient evidence to demonstrate that she is unwilling or unable to care for the children and because viable alternatives to termination of her parental rights have not been exhausted.

Discussion

Section 12-15-319(a), Ala.Code 1975, provides, in pertinent part:
“If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
The parental “responsibilities” referred to in § 12-15~319(a) include the duties to protect, to educate, to care for, to provide for, to maintain, and to support children. See Ex parte M.D.C., 39 So.3d 1117, 1121 (Ala.2009) (quoting M.D.C. v. K.D., 39 So.3d 1105, 1110 (Ala.Civ.App.2008) (Moore, J., dissenting)). Because the statute is phrased in present and future terms, a juvenile court may terminate a parent’s parental rights only if clear and convincing evidence shows that the parent is currently unable to discharge his or her parental duties properly, see D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003), and that the conduct or condition that prevents ■ the parent from assuming or exercising proper care will likely persist in the foreseeable future. See D.M. v. Walker Cnty. Dep’t of Human Res., 919 So.2d 1197, 1211 (Ala.Civ.App. 2005).
The record in this case indicates that DHR did not identify any problems with the mother’s child-rearing skills before her arrest and imprisonment in September 2009, having left the children with the mother after an investigation by a social worker. DHR obtained custody of the children only after the mother relinquished their physical custody as a result of her inability to raise them while she was confined in prison. It is undisputed that, at the time of trial, the mother was residing in a facility that would allow her to personally care for the children. Hence, at the time of trial, the problem causing the initial separation of the family no longer existed. DHR contends in its brief to this court that the juvenile court could nevertheless terminate the mother’s parental rights based solely on evidence of her past felony conviction and imprisonment. However, Ala.Code 1975, § 12-15-319(a)(4), provides that the mother’s conviction of, and imprisonment for, a felony is only a factor the juvenile court should have considered “[i]n determining whether or not [she is] unable or unwilling to discharge [her] responsibilities to and for the children].” The circumstances of this *721 case show that the mother’s imprisonment no longer prevents her from discharging her parental responsibilities to and for the children.
Additionally, the record shows that the mother’s incarceration was due to end on July 22, 2011, only three weeks after the trial. The condition that led to the separation of the family — the mother’s incarceration — was not “unlikely to change in the foreseeable future.” Of course, if the mother violates the terms of her probation, she will be subject to reincarceration, which would likely prevent her from discharging her parental responsibilities. See Ex parte A.S., 73 So.3d 1223 (Ala.2011). However, the record contains no evidence indicating that the mother was engaging, or could engage, in any activity as a resident of the Lovelady Center that would endanger her liberty. The letter from the Lovelady Center read into evidence belies any contention that the mother is likely to return to criminal behavior. The mother indicated she would remain at the facility for at least another year arid that she would not return to Huntsville where she would be surrounded by “bad influences.” Given the mother’s present circumstances, it would be speculative, at best, to conclude that the mother would, in the foreseeable future, return to prison for violating the conditions of her probation.
In its judgments, the juvenile court did not find that the mother excessively uses controlled substances in such a manner as to render her unable to care for the children. See Ala.Code 1975, § 12-15-319(a)(2). DHR nevertheless argues that the mother’s previous drug use and history of failed treatment warranted the termination of her parental rights. We note, however, that, at the time of the termination hearing, it was undisputed that the mother had not tested positive on any drug screen administered by the Lovelady Center, indicating that she was not using drugs. In M.G. v. Etowah County Department of Human Resources, 26 So.3d 436 (Ala.Civ.App.2009), the main opinion stated:
“DHR did not present any evidence from the drug-rehabilitation professionals who had treated the mother regarding the depth of the mother’s drug addiction or the extent of her recovery. One of DHR’s witnesses testified that the mother had never stopped using drugs for as long as 16 months before. DHR did not introduce any reports or elicit any testimony from any witness indicating that the mother’s current 16-month abstinence should not be considered a reliable indicator of her commitment to ending her drug problem altogether. In short, DHR produced no evidence indicating that relapse was so likely or imminent that the mother should have been considered as having a current drug problem that interfered with her ability to properly care for the children.”
26 So.3d at 443 (Per Moore, J., with one Judge concurring and one Judge concurring in the result). Similarly, in the present case, “DHR did not present any evidence ... regarding the depth of the mother’s [alleged] drug addiction or the extent of her recovery,” nor did it “introduce any reports or elicit any testimony from any witness indicating that the mother’s current ... abstinence should not be considered a reliable indicator of her commitment to ending her drug problem altogether.” Id. Accordingly, we conclude, like in M.G., that DHR failed to prove that “relapse was so likely or imminent that the mother should have been considered as having a current drug problem that interfered with her ability to properly care for the children.” Id.
*722 DHR also argues that the mother’s failure to visit the children and her lack of effort “to adjust ... her circumstances to meet the needs of the child[ren]” justified the judgments terminating her parental rights. See Ala.Code 1975, § 12-15-319(a)(10) & (12). We disagree. It is undisputed that the mother did not visit the children while she was in prison, but the record reflects that she requested visitation soon after her enrollment at the Lovelady Center. DHR refused that request on the ground that its petitions to terminate the mother’s parental rights were pending. Because the mother has not properly argued the point in her appellate brief, this court will not address the propriety of DHR’s refusal to allow her visitation for its asserted reason; however, we hold that, because the mother was not afforded any opportunity to visit with the children, the mother cannot be said to have “failed” to visit the children.
The undisputed evidence in the record also contradicts DHR’s contention that the mother has failed to adjust her circumstances to meet the needs of the children. As stated above, the “circumstance” that caused the family’s separation was the imprisonment of the mother and her resulting inability to personally care for the children. By the time of trial, that circumstance had certainly changed and, as the letter from the Lovelady Center attested, the mother had made progress in her rehabilitation program, reflecting her efforts to further adjust her circumstances to meet the children’s needs.
In its judgments, the juvenile court expressed concern over the mother’s employment and housing situations. Although the juvenile court stated that the mother had a history of minimal employment and unstable housing, DHR presented no evidence indicating that the mother had ever failed to adequately provide for the children, either from her wages or with government assistance, and the record indicates that, although the mother at one time depended on others for shelter, she and the children had enjoyed a stable residence for a lengthy period before their separation. The family was not separated because of those issues. Moreover, the evidence shows that the Lovelady Center provides adequate shelter, education, and day-care facilities for children of other mothers residing at the center, and the record contains no evidence indicating that the mother would not be able to meet the financial needs of the children while residing there.
The juvenile court evidently concluded that the children would fare better in foster care than they would residing with their mother in a group home dedicated to assisting, among others, recovering drug addicts. However, the law does not allow a family to remain separated solely because the children would be in a superi- or environment outside of their parent’s care. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1191-93 (Ala.Civ.App. 2007). The law presumes that it is in the best interests of children to be in the care of a fit parent even if another person can provide a higher standard of living. 986 So.2d at 1191-92. That presumption is overcome only when clear and convincing evidence shows that the parent cannot discharge basic parental responsibilities, id., not when clear and convincing evidence shows that others can discharge those responsibilities better. The record contains no evidence indicating that the mother will not be able to adequately protect and nurture the children while they reside together at the Lovelady Center; that a more ideal living situation exists for the children provides no basis for terminating the parental rights of the mother.
*723 As for the foreseeable future, the mother indicated that she would leave the Lovelady Center in approximately July 2012 and that she would be placed in housing and in employment with the assistance of her rehabilitation program. Nothing in the record indicates that the mother will be unable to meet the shelter and financial needs of the children just as she had before the separation of the family in 2009. Moreover, if the juvenile court doubted the ability of the mother to secure and maintain adequate employment and housing upon her departure from the Lovelady Center, the juvenile court could have provided that DHR, or other state agencies, monitor and assist the mother in that regard. A juvenile court has an imperative duty to exhaust all viable alternatives before terminating a parent’s parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala. 1990).
From the tenor of its judgments, it is apparent that the juvenile court overemphasized the past conduct, condition, and circumstances of the mother when it decided to terminate her parental rights. Although a juvenile court certainly can consider a parent’s past child-rearing history, see Ex parte State Dep’t of Human Res., 624 So.2d 589, 593 (Ala.1993), legislative policy, see M.G., 26 So.3d at 442, as well as constitutional due-process concerns, see Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), require that a parent’s parental rights be terminated based on clear and convincing evidence of that parent’s present inability or unwillingness to eare for the children that is likely to persist in the foreseeable future. When reviewing a judgment terminating parental rights, this court must determine whether the fact-finder reasonably could have determined that clear and convincing evidence established such facts. See Ex parte McInish, 47 So.3d 767, 774 (Ala.2008). Based on our review, we conclude that the record does not contain sufficient evidence indicating that the mother presently lacks the ability to adequately care for the children or that her conduct, condition, or circumstances will likely render her unable or unwilling to adequately care for the children in the foreseeable future.
For the foregoing reasons, the judgments of the juvenile court are reversed, and the cases are remanded for the juvenile court to conduct further proceedings consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and BRYAN, J., concur in the result, without writings.
THOMAS, J., concurs in the result, with writing, which PITTMAN, J., joins.

. DHR also moved to terminate the parental rights of the fathers of the children. The parental rights of any persons claiming parental rights to the children, other than the mother, were terminated on February 17, 2011. The parental rights of the fathers are not at issue in this appeal.

. The mother testified that DHR had once asked her to care for her sister’s children after those children were removed from their parents’ care. The mother had not, however, ever taken custody of her sister’s children.

.The mother testified that a friend had asked her to obtain a prescription for hydrocodone at a pharmacy and that, unbeknownst to the mother, the prescription had been forged.

. The mother admitted that she had been placed on probation before 2003 relating to another criminal matter and that she had also stopped reporting to her probation officer.

. A DHR representative testified that D.B. obtained physical custody of the children from one of the mother’s sisters.

.Through questioning, the mother's attorney indicated that he had personally requested that DHR representatives allow the mother to visit the children on other occasions. In the letter, the mother’s attorney also requested the scheduling of an Individualized Service Plan meeting, but it is unclear whether that meeting was ever scheduled.

. The mother testified that the author of this letter had observed the mother caring for the children of other residents at the facility.