MOORE, Judge.
J.S. (“the father”) appeals from a judgment of the Walker Juvenile Court (“the juvenile court”) terminating his parental rights to K.T.S. (“the child”). We affirm the juvenile court’s judgment.
Procedural History
The father and J.C. and C.C. (“the maternal uncle and aunt”) were previously before this court in J.S. v. J.C., 181 So.3d 1067 (Ala.Civ.App.2015). In J.S., this court outlined the procedural history of the case at that time as follows:
“On August 8, 2014, J.C. and C.C., the child’s maternal uncle and aunt, respectively, filed a petition to terminate the father’s parental rights to the child. The father, through counsel, filed an answer to the petition on August 19, 2014. On September 22, 2014, the father’s attorney filed a motion to withdraw, in which he indicated, among other things, that the father wished for him to withdraw as his attorney, that the father was incarcerated in the Limestone Correctional Facility, that the father was indigent and could not pay the attorney for representation, and that the father requested that the juvenile court appoint him another attorney to represent him in the present case. The juvenile court granted the motion in part, allowing the father’s attorney to withdraw, by a notation on the motion dated September 29, 2014.
“On October 16, 2014, the juvenile court entered a final judgment, terminating the parental rights of the father. In that judgment, the juvenile court noted, among other things, that the father’s attorney had withdrawn as the father’s counsel, that the father’s attorney had requested that the father receive a court-appointed attorney, and that the father had not been appointed an attorney.
“The father filed his notice of appeal to this court on October 22, 2014.”
181 So.3d at 1068. On appeal, this court determined that, “because there were facts before the juvenile court indicating that the father might be indigent, the juvenile court should have reviewed the father’s status to determine whether he was entitled to appointed counsel.” Id. at 1070. Accordingly, this court remanded the case to the juvenile court with instructions to the court to obtain the necessary information with which to determine whether the father was, at the time of the termination-of-parental-rights trial, indigent and, if it determined that he was, to appoint him an attorney and to grant him a new trial. Id.
On remand, the juvenile court entered an order on May 11, 2015, appointing an attorney to represent the father and scheduling a “rehearing” on the maternal uncle and aunt’s petition seeking to terminate the father’s parental rights for May 19, 2015. The father’s appointed attorney filed a motion to continue on May 14, 2015. On May 18, 2015, the juvenile court rescheduled the trial for May 28, 2015.[1] On May 21, 2015, the father filed a motion for transport, asserting, among other things, that he was incarcerated in the Limestone *669 Correctional Facility in Harvest and requesting that he be transported from the prison on the date of the trial in order to assist in the defense of the petition to terminate his parental rights. The juvenile court entered an order denying the father’s motion for transport on that same date.
The trial was held, on May 28, 2015. At the outset of the trial, the juvenile court noted that- it had denied the father’s motion for transport, stating: “I don’t believe he has a right to be present but I believe he has a right to be represented by counsel.” At that time, the father’s attorney objected to the juvenile court’s denial of the father’s motionfor transport, asserting that the father had a right to be present, and advised that, “if the argument is. that the State cannot afford to transport, .... [the father] will be out [of prison] in four months and -at that time he would, be able to defend himself.” Thus, the father’s attorney requested, in the alternative,, that the trial be continued until the father’s release. The juvenile court denied that motion. The juvenile court indicated at the close of the trial that it was going to grant the petition to terminate the father’s parental rights.
On June 9, 2015, the father, acting pro se, filed a postjudgment motion, asserting, among other things, that he -had not been given sufficient time to file a motion for leave to file a sworn deposition. On June 16, 2015, the father, acting pro se, filed a notice of appeal to this court. The juvenile court entered a final judgment terminating the father’s parental rights to the child on June 30, 2015. On that same- date, the juvenile court entered an order declining to address the father’s postjudgment motion, noting that it had been “improperly filed” because the father was represented ■by counsel. ■
On' July 1, 2015, the father filed an amended postjudgment motion via his counsel, adopting and incorporating the grounds stated in the father’s earlier post-judgment motion and asserting additional grounds for vacating the judgment. The father’s postjudgment motion, as amended, was denied by operation of law on July 15, 2015. see Rule 1(B), Ala. R. Juv. P. The father timely appealed.[2]
Facts
Only O.C. (“the maternal aunt”) and the father’s father, J.M.S. (“the paternal grandfather”), testified at the May 28, 2015, trial. The maternal aunt testified .that, although the child’s mother and the father had never married, they had never separated after the child was born on .June 4, 2009. The paternal grandfather testified that, before the child’s mother died, the mother, the father, and the child had resided with him for a year or two while the child was a baby. He testified that, during that time, he had witnessed the father taking care of the child, including taking the child to the doctor, changing the child’s diapers, and feeding the child. The paternal grandfather testified that the child’s mother, the father, and the child had lived in their own house, which was next door to his house, for. approximately six months, but that they had mostly lived at his house because the father was going to school, and that he and his parents, le., the child’s paternal great-grandparents, had helped provide for the mother, the father, and the child during that time. According to the maternal aunt, the child’s mother died in April 2010 and, after that, the father and *670 the child had moved in with the child’s maternal grandmother, who had supported them because, she said, the father did not work and wanted to come and go as he pleased. The paternal grandfather testified, however, that, after the child’s mother died, the father had moved in with the maternal grandmother so that she could help the father with the child while the father was in school taking drafting classes.
According to the maternal aunt, the father moved out of the maternal grandmother’s house in May 2011. She testified that she had obtained custody of the child in June or July 2011 and that, between the time the father and the child had moved out of the maternal grandmother’s house and when she had obtained custody of the child, the father had. moved with the child to a mobile home where the paternal . grandfather resides; she testified that that mobile home was unsuitable for the child based on the existence of animáis in the house, the existence of odors in the house from those animals, the existence of overgrown grass in the yard, and the existence of abandoned cars and a boat in the yard that were rotting and in disrepair, which, she said, created unsafe conditions for the child. The maternal aunt also testified that, during that time, the child had often stayed with relatives other than the father and that all of those circumstances had led her to seek custody of the child. The paternal grandfather testified that, after they moved out of the maternal grandmother’s house, the father and the child had moved back in with him, that the father had cared for the child during that time, and that the paternal grandfather had watched the child while the father went to school. The paternal grandfather stated that he works on old automobiles and that, during the period the maternal aunt was referring to, there had been a lot of automobiles that he was working on at that time in the yard, but, he said, they, had not created, any danger to the child.
The maternal aunt testified that, after she obtained' custody of the child, the father had not provided for the child’s needs and that she and her husband, J.C. (“the •maternal uncle”), had provided everything for the child, including clothes, health insurance, diapers, food, and activities. She testified that the father had not given the child any presents for the child’s birthday or for Christmas, that the father had not attended the child’s doctor’s visits or asked about them; and that the father had not attended any of the child’s school functions or inquired about the child’s education. According to the maternal aunt, she had first encouraged the father to visit the child after a hearing in 2012, but, she said, the father had always arrived late to visits, had stayed for only a short time during the visits, and had visited only once monthly or less. She testified that the father had appeared to be on drugs or medication during the visits with the child and that the father would smoke and curse around the child". She admitted later in her testimony, however, that the father had exercised his visitation with the child after she1 had received custody and that he had’ brought presents for the child on two occasions. The maternal aunt also testified that the father had had issues with drugs, that he had gone to a methadone clinic for four years, and that he had previously been arrested on drug charges and had participated in drug court, but she did not indicate when those issues had occurred. She stated that the paternal grandfather had tried to contact her once, but only after the initial termination trial, and that the child’s paternal grandmother and the father’s aunt had both contacted her several times over the 'years asking to see the child. The maternal aunt testified that, after a hearing on February 13, 2012, the *671 father had had two jobs, one at a trailer company manufacturing homes and the other .at an oil-change business, and .that each job had lasted a few months but the father had not sent any financial support for the child during that time.
The paternal grandfather testified that, after the maternal aunt had obtained custody of the child, the'father had visited the child. He stated that he did not know if the father had ever attempted to provide financial assistance for the child but that the father had taken gifts to the child. -The paternal grandfather stated that he had telephoned the child every couple of weeks since the child had been in the maternal aunt’s custody, but, he said, he had spoken to -the maternal aunt only once and .to the child only once and that, otherwise, he had •left messages and his telephone calls had not been returned. He testified that he had visited the maternal uncle and aunt’s house on two occasions, although both visits had been unannounced because his telephone calls had not been answered,- and that he had been unable to see the child on both occasions. According to the paternal grandfather, the father had worked at a trailer plant for a couple of months and, one month after he had left that job, had worked at an Express Lube oil-change business for nearly a year until he Went to prison for theft and statutory rape.
According to the maternal aunt, the father had told her that he had pleaded guilty to charges of second-degree rape and second-degree theft of property and that the rape charge involved a 13-year-old girl who the father had taken to the maternal aunt’s home and had introduced as being a friend of his sister’s. The maternal aunt testified that the father had told her that he would serve 2 years in prison and that, upon his release, he would be on probation for the remainder of his 10-year sentence. She stated that the father was in the Limestone Correctional Facility, and that, upon his release from prison, he would have to register as a sex offender. The maternal aunt testified that, since he had been in prison, the father had telephoned their home occasionally and that she had allowed the child to talk to the father, but, she said, the child did not know who the father was and did not stay on the telephone for very long. She stated .that the father had initially called once a month, that the telephone' calls had then come every couple of weeks, but then the calls had “died down” until after the initial termination trial, after which the father had begun calling at least once a week and she had declined to answer his calls. She testified that the father’s telephone calls were confusing to' the child because the father had indicated that he was coming to get the, child. The maternal aunt stated that she and the maternal uncle do not talk about the father with the child" and that the child calls the father by his first name, although she admitted that-the father had approved of that practice because he calls the paternal grandfather by his first name also. The maternal aunt testified that there is no bond between the child' and the father and that the child does not know the father.
The paternal grandfather testified that the father was due to be released from prison on September 27, 2015, and that the father wanted to maintain his parental rights. He testified that the father had been- the child’s primary caregiver and that the father and the child have a father/son relationship. The paternal grandfather testified that the father would.live with him upon his release from prison and that he believed his house would be approved as a suitable residence. According to the paternal grandfather, the father has a welding degree and would try to get a job welding .or would return to his job at *672 Express Lube upon his release from prison.
Analysis
The father first argues on appeal that the juvenile court erred in denying his motion to transport him for the trial and in refusing to grant a continuance to allow him time to prepare a deposition for presentation at the trial in liéu of appearing at trial. This court discussed whether a prisoner has the right to personally appear at a termination-of-parental-rights trial in Pignolet v. State Department of Pensions & Security, 489 So.2d 588 (Ala.Civ.App.1986). This court stated, in pertinent part:
“It has been stated that due process of law requires that there be notice, a hearing conducted in accord with that notice, and a judgment consistent with that notice and hearing. Opinion of the Justices, 345 So.2d 1354 (Ala.1977). When there is representation by counsel and an opportunity to present testimony through deposition, then due process does not require that an incarcerated parent be allowed to attend the termination trial. Eastman v. Eastman, 429 So.2d 1058 (Ala.Civ.App.1983); 16D C.J.S. Constitutional Law § 1254 (1985).
“In this case notice of the proceeding was given to the father and he was appointed an attorney to represent his interests. Under Rule 32(a)(3)(C) of the Alabama Rules of Civil Procedure, the deposition of a person who is absent from the hearing due to imprisonment can be used as though that person was present and testifying. The father’s attorney could have presented testimony from the father in the form of a deposition. After considering all of these factors, we find that the father’s fundamental rights of due process were not denied.”
Id. at 590-91. In Valero v. State Department of Human Resources, 511 So.2d 200 (Ala.Civ.App.1987), this court cited the reasoning in Pignolet and noted that the incarcerated parents in that case had had over two years between the filing of the termination petition and the termination hearing and that, as a result, all the elements listed in Pignolet—notice of the petition and the hearing, representation by counsel, and an opportunity to present testimony by deposition—were present and, thus, the parents had not been denied due process in that case. 511 So.2d at 202-03.
In M.T.D. v. Morgan County Department of Human Resources, 53 So.3d 966, 968 (Ala.Civ.App.2010), this court determined that the father in that case had failed to demonstrate that his due-process rights had been denied or violated when he did not move to attend the dependency hearing, he did not file a motion in the trial court seeking to submit his testimony by way of deposition, and he did not actually submit evidence by way of deposition during the dependency hearing. In that case, the final judgment was entered over 10 months after the filing of the dependency complaint and the father had filed a number of pro se motions and other materials in the juvenile court and in the circuit court, which had conducted a trial de novo after the juvenile court had entered an order finding that the record was not adequate for an appeal to this court. Id. at 967.
In this case, the father argues that, unlike in the above-cited cases, he was afforded neither the opportunity to be transported to the trial nor the opportunity to present his testimony by way of oral deposition. He notes that his counsel immediately moved for a continuance upon her appointment, that the juvenile court granted a continuance of only nine days, that the juvenile court denied his motion for transport only seven days before trial, and that the juvenile court denied his *673 counsel’s motions for a continuance and for the father to be transported to trial made at the outset of the trial. At no time before the juvenile court proceeded to hear testimony, however, did the father or his counsel request leave to submit the father’s testimony by deposition. Although the father notes on appeal that he alleged in his postjudgment motion, among other things, a due-process violation based on the juvenile court’s failure to allow him to file a sworn deposition, the juvenile court was not required to consider that new legal argument raised for the first time in a postjudgment motion. See McGlathery v. Alabama Agric. & Mech. Univ., 105 So.3d 437, 446 (Ala.Civ.App.2012). The father asserted in his postjudgment motion that the delay for requesting leave to present testimony by deposition was the result of his having received the denial of his motion for transport at such a late date and his mistaken belief that the trial would be held on June 28, 2015, rather than on May 28, 2015. See supra note 1. However, the father’s attorney obviously knew the correct trial date because she referenced the correct trial date in the motion for transport; thus, that knowledge was imputed to the father. See Sanders v. Flournoy, 640 So.2d 933, 939 (Ala.1994) (“Knowledge of the attorney will be imputed to the client if the knowledge comes to the attorney while engaged in a service for the client after the attorney-client relationship has commenced.”). Moreover, the father’s attorney failed to seek leave to file the father’s deposition testimony on the date of the trial, despite having filed additional motions at the outset of the trial. Considering the circumstances and the father’s opportunity to seek leave to file a deposition before the commencement of the trial, we conclude that the juvenile court did not err to reversal in declining to consider the new legal argument raised by the father in his postjudgment motion regarding the father’s opportunity to present deposition testimony at the trial.
The father next argues on appeal that the juvenile court erred in terminating his parental rights based solely on his conviction of a felony. A judgment terminating parental rights must be supported by clear and convincing evidence, which is “ ‘ “[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.”’” C.O. v. Jefferson Cty. Dep’t of Human Res., 206 So.3d 621, 627 (Ala.Civ.App.2016) (quoting L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).
“ ‘[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence'that a fact-finder reasonably could find to clearly and convincingly ,.. establish the fact sought to be proved.’
“KGS Steel[, Inc. v. McInish,] 47 So.3d [749] at 761 [ (Ala.Civ.App.2006) ].
“To analogize the test set out ... by Judge Prettyman [in Curley v. United States, 160 F.2d 229, 232-233 (D.C.Cir. 1947),] for trial courts ruling on motions for a summary judgment in civil cases to which a clear-and-convincing-evidence standard of proof applies, ‘the judge must view the evidence presented through the prism of the substantive evidentiary burden’; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the *674 trial court’s weighing of the evidence, that would ‘produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.’ ”
Ex parte McInish, 47 So.3d 767, 778 (Ala.2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court, are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 972 So.2d 1, 9 (Ala.2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So.3d 878, 879 (Ala.Civ.App.2011).
Section 12-15-319(a), Ala. Code 1975, provides, in part:
“If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[ ] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[ ] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[ ]. In determining whether or not the parent[ ] [is] unable or unwilling to discharge [his or her] responsibilities to. and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
“(4) Conviction of and imprisonment for a felony.
“(9) Failure by the parent[ ] to provide for the material needs of the child Or to pay a reasonable portion of support of the child, where the parent is able to do so.
“(10) Failure by the parent[] to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any- public or licensed private child' care agency, and agreed to by the parent.”
The juvenile court cited the father’s conviction and imprisonment for a felony as the sole ground listed in § 12-15-319 for termination of his parental rights. In its judgment, however, the juvenile court also noted the evidence indicating that the father’s visits with the child had not been consistent, that the visits had lasted a short period, and that the father had acted inappropriately at the visits; that the father had been employed only twice since July 1, 2011, with each job lasting approximately two months; that the father’s conviction was for a sex crime involving a minor child and that he would have to register as a sex offender upon his release from prison; and that the father had never provided financial or medical support for the child.
The father cites S.U. v. Madison County Department of Human Resources, 91 So.3d 716, 720 (Ala.Civ.App.2012), in support of his assertion that conviction of a felony is only one factor for the court to consider in determining whether a parent is able and willing to discharge his or her responsibilities to and for his or her child. In S.U., this court determined that, in that case, the mother’s previous conviction and imprisonment, which was to end three weeks after the trial, no longer prevented her from discharging her parental responsibilities to and for the children when there .was no evidence indicating that the *675 mother’s present circumstances were such that she could not adjust her circumstances to meet the needs of the children. Id. at 720-22. As argued by the maternal aunt and uncle in their brief to this court, however, this court noted in S.U. that the department of human resources had not identified any problems with the mother’s child-rearing skills before her arrest and imprisonment. Id. at 720. In thé present case, the maternal aunt testified that the father had failed to financially support the child before his imprisonment despite his having had two jobs for a short period. She also testified that the father’s visits with the child after she had obtained custody of the child were monthly or less. Thus, the juvenile court could have considered that, upon his release from prison, the father’s circumstances, unlike the circumstances of the mother in S.U., would be consistent with those existing before his imprisonment and that the father’s conviction further indicated that those circumstances were unlikely to change upon his release from prison. Although the paternal grandfather testified that the father would live in his home upon his release from prison, the juvenile court could have considered testimony from the maternal aunt indicating that that home was not suitable for the child and, thus, that the father’s living situation was also not likely to improve upon his release from prison. The father argues that the maternal uncle and aunt had obstructed his attempts to contact the child during his incarceration. We note, however, that the maternal aunt testified that the father’s telephone calls had decreased until after the initial termination trial. Thus, the juvenile court could have considered that the father’s efforts to maintain communication had been only in response to the filing of the .termination petition.
The father also argues on appeal that the juvenile court erred in terminating his parental rights when a viable alternative to termination exists. Citing Ex parte A.S., 73 So.3d 1223 (Ala.2011), arid Ex parte T.V., 971 So.2d 1 (Ala.2007), the father argues that maintaining the status quo in the present case was a viable alternative to the . termination of his parental rights. In A.S., the mother was imprisoned for shoplifting offenses and escape- attempts, but, in concluding that allowing the maternal grandmother’s custody of the child in that case to continue while the mother visited,and progressed toward rehabilitation was a viable alternative to termination of the mother’s parental rights, our supreme court noted that the mother had no convictions involving drugs or abuse; that she was in a treatment program in prison for her kleptomania, which apparently had led to her imprisonment; that she had maintained contact with the child through telephone calls during her imprisonment; and that she had provided a small amount of support for the child 73 So.3d at 1229-30. In the present case, however, the father had provided no support for the child; there was no indication that the father was receiving any kind of counseling or other .treatment that would help to rehabilitate him and prevent him from committing future crimes; the father’s telephone calls to the child had diminished until after the initial termination trial; and one of the father’s convictions was for the sexual abuse of a minor. Thus, the circumstances in the present case are distinguishable from those in A.S.
In T.V., our supreme court considered evidence indicating that the mother in that case had-rehabilitated her7 self and had addressed the issues that had led to the child’s placement with a friend of the mother, as well as evidence indicating that the mother had begun to establish *676 a bond with the child. 971 So.2d at 7-8. In the present case, as discussed above, the maternal aunt testified that the child does not know the father and that the child and the father did not share a bond. Also, unlike in T.V., there was no evidence presented in the present case indicating that the father’s circumstances had improved; rather, the father, whose relationship with the child had declined before his imprisonment, remained in prison for charges of theft and statutory rape at the time of the termination trial. Thus, the present case is also distinguishable from T.V.
“Parents and their children share a fundamental right to family integrity that does not dissolve simply because the parents have not been model parents. Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). That due-process right-requires states to use the most narrowly tailored means of achieving the state’s goal of protecting children from parental harm. Roe v. Conn, 417 F.Supp. 769, 779 (M.D.Ala.1976). Thus, if some less drastic alternative to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile court must explore whether that alternative can be successfully employed instead of terminating parental rights. Id.”
T.D.K. v. L.A.W., 78 So.3d 1006, 1011 (Ala.Civ.App.2011).
In S.N.W. v. M.D.F.H., 127 So.3d 1225, 1230 (Ala.Civ.App.2013), this court determined that maintaining the status quo was not a viable alternative to termination of parental rights when there were no beneficial aspects to the relationship between the father and the child, the father had not had any relationship with the child since the child’s infancy, and the father was incarcerated and would continue to be so until the child had reached the age of majority. In the present case, the maternal aunt testified that the father and the child had no bond, that the child was confused when the father telephoned from prison and stated that he was coming for the child, and that the child did not know who the father was. Like in S.N.W., the juvenile court could have determined that there was no beneficial aspect of the relationship between the father and the child such that maintaining the status quo was in the child’s best interests. Because clear and convincing evidence supports the juvenile court’s decision, we affirm the juvenile court’s judgment terminating the father’s parental rights to the child.
AFFIRMED.
Thompson, P. J., and Pittman and Donaldson, JJ., concur.
Thomas, J., concurs in the result, without writing.

. Although that order stated that the trial was reset for June 28, 2015, the order apparently contained a clerical error because the trial was conducted on May 28, 2015.

. The notice of appeal filed on June 9, 2015, by the father was held in abeyance until July 15, 2015, when the father’s amended post-judgment motion was denied by operation of law, and became, effective on that date. See Rule 4(a)(4) and (5), Ala. R. App. P. (C. 120). The father's attorney also filed a notice óf appeal on July 22, 2015,